|,ATTORNEY DISCIPLINARY PROCEEDINGS
 

 PER CURIAM.
 
 *
 

 This disciplinary matter arises from formal charges filed by the Office of Dis
 
 *84
 
 ciplinary Counsel (“ODC”) against respondent, Stephen J. Holliday, an attorney licensed to practice law in Louisiana.
 

 UNDERLYING FACTS
 

 Count I
 

 The underlying facts of this count are not disputed by respondent. On May 8, 2001, a police officer stopped respondent for speeding and driving erratically on Highland Road in Baton Rouge. Respondent acknowledged to the officer that he had consumed too much alcohol that night, but he declined to take a Breathalyzer test because he knew the results would be above the legal limit for intoxication. Respondent was arrested and charged with DWI and moving traffic violations; however, the DWI charge was ultimately dismissed. Respondent pled guilty to speeding and improper lane usage.
 

 The ODC alleges that respondent’s conduct violates Rules 8.4(a) (violation of the Rules of Professional Conduct) and 8.4(b) (commission of a criminal act, especially one that reflects adversely on the lawyer’s honesty, trustworthiness, or |2fltness as a lawyer) of the Rules of Professional Conduct. Respondent subsequently stipulated that he violated the Rules of Professional Conduct as charged in this count.
 

 Count II
 

 On Saturday evening, September 8, 2001, respondent drove to the home of his estranged wife, Amy Holliday.
 
 [1]
 
 Respondent’s two-year old daughter from his marriage to Ms. Holliday was with him in the car, and the formal charges allege that respondent was under the influence of alcohol at this time. Respondent did not find Ms. Holliday at home, but he discovered a pickup truck parked in the driveway which belonged to Ms. Holliday’s boyfriend (now husband), Martin Schmidt, Using a shovel, respondent smashed all the windows of Mr. Schmidt’s truck and caused significant damage to the body of the truck.
 
 [2]
 
 He then fled the scene prior to the arrival of the police.
 

 The following day, September 9, 2001, the police were advised as to respondent’s whereabouts near the intersection of Essen Lane and Perkins Road in Baton Rouge. As the police approached, they observed respondent proceeding in his vehicle down Perkins Road. The police followed respondent and activated their lights and sirens, but he refused to stop. The pursuit wound through a residential subdivision until respondent finally stopped in a private driveway, but he then refused to exit his vehicle as instructed. The police approached the vehicle with guns drawn and discovered respondent’s daughter in a car seat in the front passenger seat.
 

 After respondent was finally removed from his car by the police, he was arrested and charged with simple criminal damage to property and violation of a [..¿restraining order arising out of the incident involving Mr. Schmidt’s truck. Respondent was also cited for failure to yield to an emer
 
 *85
 
 gency vehicle for refusing to stop when ordered to do so by the police.
 

 The ODC alleges that respondent’s conduct violates Rules 8.4(a) and 8.4(b) of the Rules of Professional Conduct.
 

 Count III
 

 At approximately 2:00 a.m. on December 3, 2002, respondent was driving south on LSU Avenue in Baton Rouge at a high rate of speed. At the intersection of LSU Avenue and Highland Road, respondent ran a red light and broadsided a vehicle traveling eastbound on Highland Road, injuring the driver.
 
 [3]
 
 Respondent, who was highly intoxicated at the time, exited his vehicle and attempted to flee the scene of the accident by climbing a wooded ridge south of the intersection. After the police searched the wooded area and apprehended respondent, he reported that he had been with a stripper from the Gold Club in Baton Rouge and that she had been driving his vehicle at the time of the crash. This story was a fabrication, however, as independent eyewitnesses confirmed that respondent had been driving the car and that no one else was with him. Respondent was arrested and charged with DWI second offense, hit and run, disobeying a red light, reckless driving, and failing to maintain proof of insurance. After obtaining numerous continuances of the matter, respondent pled guilty in February 2005 to failing to report an accident, disobeying a red light, [ 4and reckless driving. In June 2005, petitioner obtained a court order expunging the record of his arrest.
 

 The ODC alleges that respondent’s conduct violates Rules 8.4(a), 8.4(b), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. Respondent subsequently stipulated that he violated the Rules of Professional Conduct as charged in this count.
 

 Count IV
 

 In June 2005, respondent gave a sworn statement to the ODC regarding the matters set forth in Counts I through III,
 
 supra.
 
 In response to the ODC’s questions, respondent asserted his Fifth Amendment privilege against self-incrimination. The ODC insisted that respondent answer, on the ground that at the time of the statement, all criminal charges arising out of the underlying criminal matters had either been declined or resolved via plea. Nevertheless, upon the advice of counsel, respondent maintained his privilege under the Fifth Amendment as well as a “right to privacy” under the Louisiana Constitution.
 

 The ODC alleges that respondent’s conduct violates Rules 8.1(b) (failure to respond to a lawful demand for information from a disciplinary authority) and 8.1(c) (failure to cooperate with the ODC in its investigation) of the Rules of Professional Conduct.
 

 DISCIPLINARY PROCEEDINGS
 

 In January 2006, the ODC filed four counts of formal charges against respondent, as set forth above. Respondent, through counsel, answered the formal charges and initially denied any misconduct which warranted discipline. Howev
 
 *86
 
 er, | sin May 2006, respondent gave a sworn statement to the ODC in which he acknowledged under oath some of the facts and the rule violations alleged in the formal charges.
 

 Formal Hearing
 

 This matter proceeded to a formal heax*-ing on the merits. At the hearing, respondent essentially agreed that he would not take issue with most of the factual allegations of the formal charges, with the following notable exceptions: (1) in Count II, respondent denied that he vandalized Mi". Schmidt’s pickup truck, and moi'eover, he contended that he could not have done so because he was at his father’s camp in St. Fi'ancisville on the evening of the incident in question; (2) in Count III, respondent denied any recollection of telling the police that a stripper from the Gold Club was driving his car when the accident occurred; and (3) in Count IV, respondent denied that by pleading the Fifth Amendment in his sworn statement he thereby failed to cooperate with the ODC.
 

 In suppoi't of the allegations of Count III, the ODC introduced the depositions of Corporal Kevin Heinz of the Baton Rouge City Police Department, Leslie Marchan, John Rogers, and Ning Xie. Corporal Heinz, who investigated the accident caused by respondent, testified that he found no evidence to support respondent’s claim that a stripper from the Gold Club had been di'iving his car when the accident occurred. Ms. Marchan and Mr. Rogers were driving on Highland Road that night and witnessed the accident. They both confirmed that respondent ran the red light at the intersection of Highland Road and LSU Avenue at a high rate of speed, and that no one else was in the car with respondent. Mr. Xie, the passenger in the car hit by respondent, likewise testified that he did not see anyone else in respondent’s car.
 

 | fiWith respect to the September 8, 2001 incident subject of Count II, respondent alternately testified that he did not smash Mr. Schmidt’s pickup truck or that he does not remember doing it.
 
 [4]
 
 Respondent also claimed that he was not in Baton Rouge on that night, having spent the weekend with his father and stepmother at their camp in St. Franeisville. Respondent testified that he went to St. Franeisville with his daughter on Saturday morning, September 8th, and that he has no recollection of leaving the camp until Sunday. In support of this claim, respondent offered the testimony of his stepmother, Bonnie Holliday. She testified that respondent arrived in St. Fran-cisville with his daughter on Saturday at 10:30 a.m. and stayed there until Sunday afternoon, when they all went back to Baton Rouge. Mrs. Holliday testified that no one left the camp during this time except to attend Mass on Sunday morning.
 

 The ODC presented the testimony of several witnesses in support of the allegation that respondent was the individual who vandalized Mr. Schmidt’s truck. According to the witnesses, Mr. Schmidt and Ms. Holliday had gone out to dinner on the evening of September 8th. Ms. Holli-day drove her car, leaving Mr. Schmidt’s truck parked in the driveway of her home. During the evening, respondent knocked on the door of Ms. Holliday’s home while holding his two-year old daughter in his arms. Chx-isty Caballero, who was babysitting Mr. Schmidt’s two childi'en and Ms. Holliday’s two childi*en from a prior mai'riage, came to the door and told respondent that she could not let him in.
 
 *87
 
 Respondent became angry and started banging on the door. Ms. Caballero told him that Ms. Holliday had a restraining order against him and that she was going to call the police. Respondent continued banging on the door, 17and so Ms. Caballero brought all the children into a back bedroom and called the police. She also called Ms. Holliday to advise her of the situation.
 

 Meanwhile, Ashley Mullens, who resided in a garage apartment at the rear of Ms. Holliday’s property, heard loud banging and yelling coming from Ms. Holliday’s front yard. Ms. Mullens looked out of her window, which overlooked Ms. Holliday’s driveway, and saw a man hitting the pickup truck parked in the driveway while holding a small child in his arms. Because it was dark, Ms. Mullens was not able to see the man’s face, but she was clear that the man was holding a child as he vandalized the truck.
 

 When Mr. Schmidt and Ms. Holliday arrived home, Mr. Schmidt noticed that his truck looked like it “had ice all over it.” Mr. Schmidt then discovered that every window and mirror in the truck had been “smashed to pieces.” Ms. Holliday called the police, and Corporal Kenneth Bowman of the Baton Rouge City Police Department arrived at midnight to investigate the matter.
 
 [5]
 
 He observed that the damage to the truck had apparently been caused by a shovel that had been left next to the truck. After taking statements from Ms. Caballero and Ms. Mullens, and photographing the damage to the truck, Corporal Bowman went to respondent’s residence, but he was not there.
 

 Respondent was ultimately arrested on Sunday after a police pursuit. During booking, respondent told Corporal Bowman that he had gone to Ms. Holliday’s residence on Saturday evening to pick up their daughter because Ms. Holliday was going out with one of her girlfriends. Later, respondent found out that Ms. Holli-day was actually going out with another man. Respondent told Corporal Bowman that he | ^became concerned about Ms. Hol-liday’s other children when he called her house and did not get an answer, so he went over there to check on the children. Respondent stated that when he got to the house he was greeted at the door by a female he did not know but who he assumed was the babysitter. The babysitter told respondent that he had to leave or that she was going to call the police. Respondent told Corporal Bowman that he then left the residence and went to St. Francisville, where his father has a camp. Respondent also told Corporal Bowman that he knew about the restraining order against him but thought that it had expired, and that Ms. Holliday was just trying to make him “look bad in the divorce.”
 

 An issue arose at the formal hearing concerning whether respondent had made any admissions concerning this incident to a social worker, David Rougeau. Mr. Rougeau saw respondent for counseling from August 2001 to July 2002, and he was called as a witness by respondent to testify concerning the acrimony of his divorce from Ms. Holliday, among other issues. On cross-examination, Mr. Rougeau testified that during counseling, respondent had discussed with him the incident involving Mr. Schmidt’s truck, and that respondent had admitted he had “taken a shovel” to the truck and “beat it up.” Because this admission was not referenced in the records of respondent’s treatment
 
 *88
 
 which Mr. Rougeau had brought to the hearing, the parties agreed that Mr. Rougeau would return to his office and search for the additional records. The committee chair gave explicit instructions that any records Mr. Rougeau found were not to be “shared or discussed with any other witnesses to this proceeding prior to the Office of Disciplinary Counsel and the respondent’s attorney [having] an opportunity to review those records.”
 

 When Mr. Rougeau returned to the hearing, he gave his records to respondent’s counsel only. Mr. Rougeau was also seen conferring with respondent and his counsel Routside the presence of the disciplinary counsel. Thereafter', Mr. Rougeau took the stand and testified that he “could not find any specific reference” in his notes to an admission by respondent to having vandalized Mr. Schmidt’s truck. Furthermore, Mr. Rougeau testified that he was now “not sure” whether respondent had admitted to vandalizing the truck, or simply that he had been accused of
 
 doing
 
 so.
 

 For his part, respondent did not know whether he had or had not spoken to Mr. Rougeau about the truck incident, but claimed that if he had talked to him about the incident, it was simply to report that he had been accused of vandalizing Mr. Schmidt’s truck. Nevertheless, respondent continued to deny any memory of actually committing that act, stating, “I don’t remember doing it. I don’t think I did it.”
 

 Hearing Committee Report
 

 After considering the evidence and testimony presented at the hearing, the hearing committee made the following factual findings:
 

 Count
 
 1 — The committee found that on May 8, 2001, respondent was arrested and charged with the crime of driving while intoxicated, among other crimes. While respondent ultimately pled guilty to reckless operation, not DWI, the committee found the ODC presented evidence showing that respondent had, in fact, driven while intoxicated. For example, Captain Joseph Bourgeois of the Baton Rouge City Police Department testified that respondent’s performance on the HGN (horizontal gaze nystagmus) test was consistent with intoxication, and that respondent smelled strongly of alcohol and spoke with slurred speech. Considering this evidence, the committee concluded the ODC proved to a clear and convincing standard that respondent engaged in illegal conduct by driving his vehicle while intoxicated and driving erratically and at a high rate of speed, all as alleged in Count I.
 

 | wCount
 
 II
 
 — The ODC alleges that respondent engaged in illegal conduct by smashing Mr. Schmidt’s truck with a shovel, and by later fleeing from police when they tried to pull over his vehicle. As alleged, when respondent finally stopped his vehicle, police approached with guns drawn and discovered respondent’s minor child in the front passenger seat. Respondent admits that he ignored a lawful order of the police to pull over his vehicle, and that he endangered his daughter, himself, and others in the process. However, respondent denies smashing the truck.
 

 The committee found the ODC proved by clear and convincing evidence that respondent smashed Mr. Schmidt’s truck with a shovel. The committee found respondent admitted to Mr. Rougeau during a counseling session that he had done so,
 
 [6]
 
 
 *89
 
 but noted this was by no means the only evidence placing respondent at his estranged wife’s house on the night of September 8, 2001. In rejecting respondent’s alibi that he was in St. Francisville that evening, the committee relied upon respondent’s admission (as reflected in the police report) that he had been at Ms. Holliday’s house on the night of September 8th and then had later gone to St. Francisville. The committee also noted that respondent paid $9,000 to settle the claim for damages to the truck. Furthermore, the committee was persuaded by the testimony of Ms. Mullens, the garage apartment tenant, who saw the perpetrator using a shovel to smash the truck with one hand while holding a small child in the other hand. This person was identified through other evidence as respondent. Considering | nall of the documentary and testimonial evidence together, the committee found the ODC “amply carried its burden of proof on Count II.”
 

 Cowit III
 
 — The ODC alleges that on December 3, 2002, respondent was again driving while intoxicated and operating his vehicle in a dangerous manner when he failed to observe a red light and crashed into another vehicle. The ODC also alleges that respondent fled the scene of the accident on foot, and that after he was apprehended, he falsely told police that a stripper had been driving his car at the time of the accident. Respondent admits all of the facts alleged in this count, with the exception of having fabricated the story about someone else driving his car.
 

 The committee found the ODC proved by clear and convincing evidence that respondent drove while intoxicated, crashed his vehicle and injured the driver of the other vehicle involved, and fled the scene. Once he was apprehended, respondent told police a fabricated story about a stripper driving his car at the time of the crash. The ODC introduced the testimony of the arresting officers, one of the victims of the crash, and the other witnesses at the scene. Their testimony was consistent that no one else was in the car driven by respondent.
 

 Count IV
 
 — The committee found the ODC proved by clear and convincing evidence that respondent failed to cooperate during the taking of his sworn statement on June 9, 2005. Respondent thwarted the ODC’s legitimate inquiries during the taking of the sworn statement, and there was no legal justification excusing his full cooperation with the ODC. For example, respondent invoked the Fifth Amendment when the ODC asked how many times he had been arrested in his life. On the date of the sworn statement, respondent had reached plea agreements on the two DWI charges of which the ODC was aware. Notwithstanding the pleas, respondent argues that he could claim a Fifth Amendment privilege even after the plea agreements. However, the committee found that respondent was not subject to incriminating 112himself by answering the question of how many times he had been arrested. Moreover, the committee found that it was not criminal jeopardy respondent was attempting to avoid, but rather jeopardy in the attorney disciplinary system. Finding respondent “would take any steps to avoid a full picture of his sanctionable misconduct from coming to light,” the committee concluded that respondent’s “approach to invoking constitutional privileges against self-incrimination is insupportable” and
 
 *90
 
 that “nothing in Rule XIX or the Rules of Professional Conduct countenances gamesmanship when answering for one’s own suitability and fitness to practice law.” The committee further rejected respondent’s claim that he could refuse to answer based upon a right of privacy. The committee noted that contrary to respondent’s assertion that the formal charges were the result of a complaint filed against him by Ms. Holliday seeking to gain an advantage in the ongoing child custody dispute, the ODC initiated its investigation after respondent’s DWI arrest was reported in the local newspaper.
 

 Based on these factual findings, the committee determined that respondent violated the Rules of Professional Conduct as charged in the formal charges. The committee determined that respondent violated duties owed to the public and to the profession. Respondent’s actions were, by their very nature, knowing and intentional. The consequences of respondent’s actions were potentially serious, although in some instances, actual harm resulted, as when respondent injured a woman while driving under the influence of alcohol and when he caused more than $10,000 in damage to Mr. Schmidt’s truck. The baseline sanction for respondent’s misconduct is suspension.
 

 The committee found the following aggravating factors apply: a dishonest or selfish motive, a pattern of misconduct, multiple offenses, bad faith obstruction of the disciplinary proceeding, refusal to acknowledge the wrongful nature of the eon-duct, |1sand substantial experience in the practice of law (admitted 1995). In mitigation, the committee recognized the following factors: absence of a prior disciplinary record and personal or emotional problems stemming from respondent’s acrimonious divorce.
 

 Regarding the issue of an appropriate sanction, the committee considered the similarity of Count III to the facts of
 
 In re: Marinoff,
 
 01-2584 (La.6/7/02), 819 So.2d 305. In
 
 Marinoff,
 
 the respondent drove himself and a friend home from a bar. Mr. Marinoff, who was intoxicated, lost control of the car and it flipped several times, ejecting the passenger from the car and badly injuring her. Mr. Marinoff received relatively minor injuries. When two passersby stopped at the accident scene, Mr. Marinoff falsely claimed that everyone else in the car was dead. After the passersby returned from calling 911, Mr. Marinoff changed his story and claimed that no one else had been in the car. He also asked several times to be taken away from the scene, indicating that he did not want any attention drawn to himself because he had “already been in trouble once before.” Fortunately, the passersby ignored Mr. Marinoff and eventually discovered the badly injured passenger. When Mr. Marinoff was transported to the hospital, he changed his story yet again, falsely telling police that an individual named “Jason” had been driving the car at the time of the accident. This court found that after the accident, respondent engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation in violation of Rule 8.4(c). For this misconduct, Mr. Marinoff was suspended from the practice of law for six months.
 

 In contrast, the committee found respondent’s misconduct was much more serious. Respondent engaged in not one but three instances of misconduct which reflect adversely on his fitness to practice law. Both the truck-bashing incident and respondent’s second DWI resulted in actual, serious harm, and during the latter incident respondent made false statements in an effort to avoid criminal | ^consequences. Respondent also has a fourth instance of
 
 *91
 
 misconduct in failing to cooperate with the ODC.
 

 In light of this misconduct, and noting that the aggravating circumstances far outweigh the mitigating circumstances, the committee recommended that respondent be suspended from the practice of law for two years.
 

 Both respondent and the ODC objected to the hearing committee’s report. Respondent took issue with the committee’s findings and argued that the sanction in this case should not exceed that which was imposed in
 
 Marimff.
 
 The ODC argued that respondent should be disbarred.
 

 Disciplinary Board Recommendation
 

 After review, the disciplinary board found that the hearing committee’s factual findings are not manifestly erroneous, with one clarification. In Count II, the ODC alleged that respondent was under the influence of alcohol the night he vandalized Mr. Schmidt’s truck. Although the committee found the ODC “amply carried its burden of proof on Count II,” the committee did not specifically find that respondent was under the influence of alcohol that evening. Regardless, the board found there is no evidence in the record to suggest that respondent was under the influence of alcohol during the events described in Count II. Accordingly, the board clarified the committee’s findings of fact on that point.
 

 The board agreed with the committee that respondent violated the Rules of Professional Conduct as charged in the formal charges. The board determined that respondent violated duties owed to the public and the profession. Respondent’s conduct was knowing and intentional. In Count I, respondent drove a vehicle at a high rate of speed while intoxicated, presenting a high risk of potentially serious harm to the public. In Count II, respondent placed his minor daughter in danger by | ^smashing a truck with a shovel while he held her in his arms. Further, with his daughter in the car, respondent refused to stop for police officers, causing the officers to approach respondent’s car with guns drawn after he eventually stopped. This is a second incident in which respondent put his daughter’s well-being at risk. In Count III, respondent’s reckless conduct caused actual harm to the passengers of the vehicle he struck. Ms. Tran, the driver of the vehicle, testified that she still experiences pain as a result of the accident.
 

 In determining the applicable baseline sanction in this matter, the board looked to the ABA’s
 
 Standards far Imposing Lawyer Sanctions
 
 and determined that the baseline sanction for respondent’s criminal acts is suspension. The board noted that this case is not limited to criminal conduct, however. Rather, the board felt respondent’s dishonesty and obstruction during the disciplinary proceeding are the central focus of the case, which warrant an upward deviation in the baseline sanction. The board observed that respondent has obstructed this proceeding by refusing to answer routine questions under the guise of a constitutional privilege. Further, he refused to admit liability for damaging Mr. Schmidt’s truck, despite overwhelming evidence that places him at the scene. Given this overwhelming evidence,' the board found that respondent’s stepmother apparently offered false testimony at his prompting in an attempt to deflect responsibility for his actions. The board concluded this was “intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer’s fitness to practice,” within the scope of Standard 5.11(b), and therefore the applicable baseline sanction is disbarment.
 

 The board found the following aggravating factors apply: a pattern of miscon
 
 *92
 
 duct, multiple offenses, bad faith obstruction of the disciplinary proceeding, refusal to acknowledge the wrongful nature of the conduct, and substantial experience |1(iin the practice of law. In mitigation, the board recognized the following factors: absence of a prior disciplinary record and personal or emotional problems.
 

 The board found very little prior jurisprudence similar to the unique facts of this case. Respondent’s conduct in Count III is similar to
 
 Marinoff,
 
 in that he caused an accident while highly intoxicated, injuring two other people. He attempted to flee the scene of the accident on foot, but was apprehended by police. Upon questioning, respondent claimed not to be the driver of the car. Considering these facts, the board found respondent’s actions and statements were an attempt to deceive the police.
 

 However, respondent also engaged in other misconduct. The incident in Count III was respondent’s second arrest for DWI. The first arrest is described in Count I. Further, in Count II, respondent endangered the well-being of his young daughter by engaging in reckless behavior. While respondent has admitted to most of the misconduct, he still vigorously denies liability for damaging Mr. Schmidt’s truck, going to the extreme extent of offering what appears to be false testimony from his stepmother. The facts, as found by the committee and supported by the record, indicate otherwise.
 

 Finally, and most significantly, respondent attempted to disrupt the ODC’s investigation of this matter by unjustifiably invoking constitutional protections and offering false testimony. In
 
 In re: Harris,
 
 03-0212 (La.5/9/03), 847 So.2d 1185, the court permanently disbarred a lawyer who offered false testimony and fabricated evidence in a disciplinary matter.
 
 [7]
 
 While the board did not feel respondent’s conduct 117rose to the level of that seen in
 
 Harris,
 
 respondent did engage in a calculated effort to obstruct the ODC’s investigation of this case and offered what appears .to be the false testimony of his stepmother.
 

 Under all these circumstances, the board recommended that respondent be disbarred. One board member dissented and would recommend a lengthy suspension from the practice of law.
 

 Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
 

 DISCUSSION
 

 Bar disciplinary matters fall within the original jurisdiction of this court. La, Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence.
 
 In re: Quaid,
 
 94-1316 (La.11/30/94), 646 So.2d 343;
 
 Louisiana State Bar Ass’n v. Boutall,
 
 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing
 
 *93
 
 committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings.
 
 See In re: Caulfield,
 
 96-1401 (La.11/25/96), 683 So.2d 714;
 
 In re: Pardue,
 
 93-2865 (La.3/11/94), 633 So.2d 150.
 

 Respondent has stipulated to the underlying facts regarding the criminal offenses which form the basis of Counts I and III.
 
 [8]
 
 Therefore, our focus is on the | isfactual findings in the truck vandalism matter (Count II) and the failure to cooperate matter (Count IV).
 

 The crux of the allegation in Count II is that respondent vandalized a truck belonging to his estranged wife’s boyfriend while it was parked at his wife’s home in Baton Rouge. The record reveals the ODC’s case depended in large measure on the testimony of two witnesses, Christy Caballero and Ashley Mullens. Ms. Caballero testified she was babysitting at the home of respondent’s estranged wife on the night of the incident. She testified respondent knocked on the door while holding his two-year old daughter and that he became angry when she would not let him in. Ms. Mullens, a resident of the garage apartment at the rear of the property, testified she saw a man hitting a pickup truck in the driveway. Although Ms. Mullens could not identify the man, she testified he was holding a child in his arms as he vandalized the truck.
 

 In opposition to the evidence produced by the ODC, respondent testified that he was in St. Franeisville on the night of the incident and did not return to Baton Rouge until the next day. As corroboration, he relied on the testimony of his stepmother, who indicated he was in St. Franeisville during the relevant time period.
 

 After hearing testimony from all the witnesses, the hearing committee made a factual finding that respondent was responsible for vandalizing the truck. In
 
 In re: Bolton,
 
 02-0257 (La.6/21/02), 820 So.2d 548, we explained that although this court is the trier of fact in bar disciplinary cases, we are not prepared to disregard the credibility evaluations made by those committee members who were present during respondent’s testimony and who act as the eyes and ears of this court. Therefore, we find no manifest error in the hearing committee’s factual finding that the ODC proved the allegations of Count II by clear and convincing evidence.
 

 ^Nonetheless, we must reject the disciplinary board’s finding that respondent presented false testimony and fabricated evidence in connection with Count II. As a threshold matter, we note the hearing committee made no such factual finding. Because the disciplinary board serves an appellate review function under Supreme Rule XIX, § 11(F), it should refrain from making findings based on a cold record.
 
 See, e.g., Canter v. Koehring Co.,
 
 283 So.2d 716, 724 (La.1973) (holding that the trier of fact has a better capacity to evaluate live witnesses as compared with the appellate court’s access only to a cold record).
 

 Moreover, in the event respondent presented false statements during the disciplinary process, due process requires that such misconduct should be addressed
 
 *94
 
 through separate formal charges.
 
 See In re: Harris,
 
 00-1825 p. 12 (La.11/13/00), 774 So.2d 963, 969 (“[u]nder the circumstances of this case, and in consideration of the interests of justice and due process, we believe this misconduct should be alleged by separate formal charges”). Accordingly, while we find the allegations of Count II have been proven by clear and convincing evidence, we decline to make any finding that respondent presented false or fabricated testimony in connection with this count.
 
 [9]
 

 In Count IV, the ODC’s allegation that respondent failed to cooperate is based on his refusal to answer questions during the course of his sworn statement on June 9, 2005. Although respondent invoked his Fifth Amendment privilege in response to questions concerning his prior arrests, the committee made a finding that the questions asked by the ODC would not have resulted in respondent’s incriminating himself. As a result, the committee found respondent failed to cooperate with the ODC’s investigation.
 

 12pThe Self-incrimination Clause of the Fifth Amendment, as incorporated in the Fourteenth Amendment, extends to disciplinary proceedings.
 
 Spevack v. Klein,
 
 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). However, there must be a reasonable basis for the assertion of the privilege. As the Court explained in
 
 Hoffman v. United States,
 
 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), “[t]he witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself — his
 
 say
 
 — so does not of itself establish the hazard of incrimination.” Rather, the protection of the Fifth Amendment must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer.
 
 Id.
 

 In the instant case, the record supports the hearing committee’s factual finding that respondent’s assertion of the Fifth Amendment privilege was not reasonable under these facts. It is undisputed that at the time of the sworn statement, respondent had reached plea agreements on his two DWI charges. Thus, we fail to see how the ODC’s questions regarding how many times he had been arrested could have placed respondent in jeopai-dy. Likewise, respondent’s vague assertion of a “privacy” interest did not justify his refusal to answer the ODC’s questions. Under these circumstances, we find no manifest error in the hearing committee’s factual finding that respondent failed to cooperate with the ODC.
 
 [10]
 

 Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In considering that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct.
 
 Louisiana State Bar Ass’n v. Reis,
 
 513 So.2d 1173 (La.1987).21 The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances.
 
 Louisiana
 
 
 *95
 

 State Bar Ass’n v. Whittington,
 
 459 So.2d 520 (La.1984).
 

 As the board observed, there is not much prior case law directly on point with the facts of the instant misconduct. However, there is little doubt that respondent’s conduct is serious in nature. Taken as a whole, the charges against respondent demonstrate he has acted with callous disregard for the law, causing both potential and actual harm.
 

 Numerous aggravating factors are present, including a dishonest or selfish motive, a pattern of misconduct, multiple offenses, bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with the rules or orders of the disciplinary agency, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim, and substantial experience in the practice of law. The sole mitigating factors supported by the record are the absence of a prior disciplinary record and personal or emotional problems.
 

 Considering all these circumstances, we conclude the appropriate sanction in this case is a three-year suspension from the practice of law.
 

 DECREE
 

 Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Stephen J. Holliday, Louisiana Bar Roll number 23496, be and he hereby is suspended from the practice of law for three years. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule 122XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
 

 *
 

 Retired Judge Robert Lobrano, assigned as Justice
 
 ad hoc,
 
 sitting for Chief Justice Catherine D. Kimball, recused. Retired Judge Philip Ciaccio, assigned as Justice
 
 ad hoc,
 
 sitting for Justice Chet D. Traylor, now retired.
 

 [1]
 

 . Respondent and Ms. Holliday had separated in July 2001 after three years of marriage. They were ultimately divorced by judgment rendered in February 2002.
 

 [2]
 

 . In 2002, respondent reimbursed Mr. Schmidt’s insurance carrier some $9,000 for the damage to the truck.
 

 [3]
 

 . The police report of the accident indicates that Elizabeth Tran suffered moderate injuries when respondent hit the car she was driving. Ms. Tran testified at the formal charge hearing that she had to quit her job as the manager of a retail store because she had back pain and could not stand for long periods of time. Ms. Tran had none of these problems prior to the accident, and even after medical treatment, she still is not fully healed and continues to suffer pain. Ms. Tran has settled the lawsuit she filed against respondent for the injuries she suffered in the accident.
 

 [4]
 

 . Respondent testified:
 

 No, I don’t. I don’t have any recollection of that. I don’t remember it. I don’t think I did it In fact I didn't do it.
 

 [5]
 

 . The police report indicates that Corporal Bowman was dispatched in response to Ms. Holliday's call. It is unclear whether police ever went to Ms. Holliday's residence in response to the call placed by Ms. Caballero.
 

 [6]
 

 . In making this finding, the committee related the controversy surrounding Mr. Roug-eau's testimony and the production of his treatment notes, and then stated:
 

 
 *89
 
 Having viewed this witness, assessed his demeanor, and evaluated the circumstances surrounding his testimony, we find Mr. Rougeau’s first version of events to be the most credible recitation of what occurred. That is, we find that Mr. Holliday admitted to Mr. Rougeau during a counseling session that Mr. Holliday had bashed the truck.
 

 [7]
 

 . In
 
 Harris,
 
 ibe lawyer claimed that he returned funds to his client in the form of several money orders, copies of which he introduced into evidence at the disciplinary hearing. However, the ODC discovered that these money orders did not match the ones ultimately received by the client, and that some of the client's money orders were not even purchased until after the disciplinary hearing. To explain this discrepancy, Mr. Harris offered a fabricated confession in which his late sister claimed to have stolen the original money orders from the client's file and to have then purchased replacement money orders. The ODC disproved the authenticity of this confession with the testimony of a handwriting expert and
 
 the
 
 testimony of the sister's husband and son.
 

 [8]
 

 . While respondent had challenged the ODC's assertion in Count III that he falsely told police that a stripper had been driving his car at the time of the accident, respondent appears to have abandoned that issue in his brief filed in this court. To the extent respondent continues to maintain his position, however, we find the evidence in the record is clear and convincing that respondent's post-accident conduct involved elements of dishonesty, deceit, and misrepresentation, in violation of Rule 8.4(c).
 

 [9]
 

 . Nothing in this opinion should be construed as expressing any view on whether the filing of additional formal charges is justified under the facts of this case.
 

 [10]
 

 . Because we ultimately find respondent could not validly claim a Fifth Amendment privilege, we need not pass on whether the ODC’s rejection of his assertion of the privilege should have been subject to immediate review. However, we note some states have adopted such a procedure in disciplinary cases.
 
 See In re Zisook,
 
 88 Ill.2d 321, 58 Ill.Dec. 786, 430 N.E.2d 1037 (1981).