ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
11 This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Charles Williams, an attorney licensed to practice law in Louisiana, but currently suspended from practice.
PRIOR DISCIPLINARY HISTORY
Before we address the current charges, we find it helpful to review respondent’s prior disciplinary history. Respondent was admitted to the practice of law in Louisiana in 1977. In 1985, respondent was privately reprimanded by the Committee on Professional Responsibility for issuing a $100 check drawn on a closed bank account and thereafter refusing to make the check good, despite repeated attempts by the payee to collect.
In 1986, this court suspended respondent for a minimum term of two years for improperly entering into a business transaction with a client, charging an excessive legal fee in a worker’s compensation case, and neglecting a legal matter. Louisiana State Bar Ass’n v. Williams, 498 So.2d 727 (La.1986) (“Williams I”). The court’s judgment in Williams I provided that respondent could seek reinstatement at the end of the two-year period, provided he had fulfilled certain | ¡.conditions;[1] however, if respondent had not fulfilled all of the specified conditions, “his suspension from the practice of law shall continue indefinitely.”
Respondent had not sought reinstatement from his suspension in Williams I when it came to the ODC’s attention that in 1998, while employed as a paralegal, respondent had accompanied two of his employer’s clients to sworn statements taken by counsel for the insurance company in a personal injury claim. Respondent actively participated in the sworn statements, indicated that he was an attorney, and advised the clients how to answer questions asked of them. In 2003, respondent was suspended for an additional two years, with all but one year and one day deferred, for his unauthorized practice of law. In re: Williams, 02-2698 (La.4/9/03), 842 So.2d 353 (“Williams II”). Respondent has not been reinstated from his suspension in Williams II, nor has he fulfilled the conditions of reinstatement ordered in Williams I; accordingly, respondent remains suspended from the practice of law.
Against this backdrop, we now turn to a consideration of the misconduct at issue in the present proceeding.
*586 UNDERLYING FACTS
It is undisputed that on Thanksgiving Day, November 25, 2004, respondent shot and killed Larry Broome, with whom he had been friends for some thirty-five years.[2] The shooting occurred in the course of an altercation between respondent |3and the victim in the parking lot of the Club Nexus bar in Benton, Louisiana. Respondent has consistently maintained that he acted in self-defense.[3]
Respondent was arrested following the shooting and charged with manslaughter. On May 9, 2006, respondent pleaded guilty as charged. Pursuant to a plea agreement, he was sentenced to serve ten years at hard labor, suspended, and placed on active probation for three years with special conditions. However, unbeknownst to the parties involved in the plea colloquy, the trial judge lacked the authority to suspend respondent’s sentence and to place him on probation.[4]
Thereafter, respondent appealed the legality of his sentence. In February 2009, this court vacated the sentence and remanded the matter to allow respondent the opportunity to withdraw his guilty plea and to plead anew. State ex rel. Williams v. State, 08-1059 (La.2/6/09), 999 So.2d 1136. Upon remand, respondent pleaded not guilty, and the Bossier Parish District Attorney’s Office ultimately declined to prosecute the matter any further.
DISCIPLINARY PROCEEDINGS
In July 2007, the ODC filed one count of formal charges against respondent, alleging that by his actions as set forth above he has committed a criminal act in violation of Rule 8.4(b) of the Rules of Professional Conduct. In January 2008, the ODC supplemented and amended the formal charges to assert that permanent disbarment is appropriate in this case.
Respondent answered the formal charges and denied any misconduct. He contended that he entered a guilty plea to the manslaughter charge in 2006 as a result of his “extensive and coercive incarceration” in the Bossier Parish jail 1 ¿following his arrest, and he maintained that he had acted in self-defense in the shooting death of the victim. Respondent therefore suggested that the formal charges should be dismissed. In response to the amended formal charges, respondent again contended that he acted in self-defense and therefore did not violate the Rules of Professional Conduct. Furthermore, respondent denied that his conduct justifies the imposition of permanent disbarment.
This matter was originally set for hearing in October 2007; however, that hearing was continued pending further proceedings in respondent’s criminal case. A hearing was subsequently held in March 2008, at which time the ODC introduced the certificate of respondent’s conviction and rested. Respondent testified on his own behalf. The hearing committee then took the matter under advisement pending the outcome of respondent’s appeal of his sentence.
*587 As discussed above, respondent’s appeal was successful. His guilty plea was vacated, and in 2009, the criminal case was concluded when the Bossier Parish District Attorney’s Office decided not to prosecute the matter further. Accordingly, the ODC was unable to pursue discipline based upon Supreme Court Rule XIX, § 19, which requires a criminal conviction. Nevertheless, the ODC chose to proceed with the formal charges against respondent based upon allegations that he committed a criminal act, in violation of Rule 8.4(b) of the Rules of Professional Conduct. A second hearing was held to consider this issue in August 2010. During the hearing, the ODC called two witnesses to testify: Vernon Broome (the brother of the victim) and Detective Thomas C. Bloxom, a deputy with the Bossier Parish Sheriffs Office. Respondent testified on his own behalf and on cross-examination by the ODC.
The evidence as adduced at the hearing may be summarized as follows. In December 2008, the victim invited respondent to work at his bar, Club Nexus, which is located in a sparsely populated, rural area on the outskirts of Benton, ^Louisiana. The victim offered to pay respondent $700 a week for this employment, and said respondent could live with him in the house he owned in the back of the club. Respondent agreed to the arrangement and moved to Benton from his home in New Orleans.
On Thanksgiving Day in 2004, the victim was still asleep when respondent left the house to take a walk. As he often did, respondent went to visit Vernon Broome, whose house was about half a mile north of the club on Highway 3. Respondent always carried his .32 caliber pistol with him when he walked in this area, as there were snakes in the nearby woods.[5]
A short time later, at about 11:00 a.m., John Charles Griffin, a friend of Vernon Broome, drove to Vernon Broome’s house to tell respondent that a customer had shown up at the club to purchase liquor, but the club was closed. Respondent was told or surmised that the victim was now awake and was angry he had not yet opened the club, so he rode back to the club with Mr. Griffin. Vernon Broome said he would get his dog and would be along in a few minutes.
When respondent and Mr. Griffin arrived at the club, the victim was in the parking lot. The victim told respondent to get off his property, and an altercation ensued between them. Mr. Griffin did not intervene and decided to leave the club. Just as he started to pull out of the parking lot, Vernon Broome drove up. Mr. Griffin stopped and told Vernon Broome that he needed to speak with him back at his house. Vernon Broome heard the victim and respondent arguing; nevertheless, he turned around to put the dog back into his truck so that he could go home to talk with Mr. Griffin. Vernon Broome then got into the truck and started to drive away. IfiAs he did so, he heard a gunshot.[6] Vernon Broome put the truck into reverse and backed up into the parking lot, where he saw the victim slumped against his truck with his chin on his chest. Vernon Broome got out of the truck and ran to *588 ward respondent, who was holding a gun in his hand, and asked respondent whether he had shot the victim. Respondent mumbled something in reply and then threw the gun into some weeds on the south side of the parking lot.
Vernon Broome ran into the club and called 911, but he dropped the telephone before speaking to an operator. Vernon Broome then went back into the parking lot and he and respondent put the victim into his truck and took him to the Benton fire station. The victim was airlifted from the fire station to the LSU Medical Center in Shreveport, but he died en route to the hospital or shortly after arriving there.
The Bossier Parish Sheriffs Office was dispatched to the club by the 911 operator. Officers found a spent .32 caliber shell casing and respondent’s .32 caliber pistol in the parking lot of the club, and a spent .380 caliber shell casing on the sidewalk in front of the house at the rear of the club premises. After using respondent’s key to gain access to the house, the police found the victim’s .380 caliber pistol on his bed underneath a pillow.
When the police took respondent’s statement, he explained that upon arriving at the club with Mr. Griffin, the victim immediately pulled him out of the truck and started yelling at him about why he had not already opened the club for the day. The victim then began punching respondent with his left hand, keeping his right hand in the pocket of his jacket. Respondent said that he knew the victim owned a gun, a .380 caliber pistol, and that he always had the gun with him in his 17pocket. Fearing that his life was in danger, respondent fired a single shot at the victim, striking him in the chest:
And you know he was telling me you know get off my property, such and such and so and so. And one thing led to another. And he pushed me all the way from behind the truck and all that. I don’t know if Vernon and them saw everything. But then he punched me on the left side of my jaw. And when he got to the truck door he told me to go for it. You know like he was gonna shoot me. And I went for it. And you know I was trying to hit him in the arm, but it happened so fast. And when I realized I hit him that’s when I threw the pistol away and called Vernon and tried to get him to the hospital as soon as possible. [Emphasis added.]
Respondent told the detective that when the victim told him to “go for it,” while holding his hand in his pocket as if a gun were there, he perceived he was being threatened. Furthermore, he stated that the victim was a “big dude” much larger than he was,[7] and that the victim had been violent towards him in the past. Notably, however, no gun was found on the victim’s person, and the detective who conducted the interview did not observe any wounds on respondent’s head or face, or any tears in the clothing he was wearing.[8]
An autopsy was subsequently performed on the victim’s body. The report of the autopsy states that the victim’s death was due to a gunshot wound of the chest, resulting in severe blood loss from multiple organ lacerations. The entrance wound was on the left anterior axillary line at the level of the left axilla. The bullet path was anterior to posterior, left to right, and *589 superior to inferior. The bullet fractured the second rib on the left anterior axillary line, lacerated both upper and lower lobes of the left lung, fractured the left sixth rib near the spine, and then | traveled downward along the spine. The bullet was lodged in the muscle adjacent to the left side of the spine.[9]

Hearing Committee Report

After reviewing the testimony and the evidence presented at the hearing, the hearing committee made the following factual findings:
Respondent claims that as soon as Mr. Griffin drove up to the club, the victim pulled him out of the truck, threw him to the ground, and began beating him. However, when Mr. Griffin testified during the preliminary examination hearing in respondent’s criminal case, he did not corroborate respondent’s assertion that he had been pulled from the truck and beaten. Mr. Griffin also did not confirm that the victim threatened respondent by implying he had a gun in his hand in his jacket. However, Mr. Griffin did verify that respondent and the victim had “a heated argument.”
About five minutes after respondent arrived at the club with Mr. Griffin, Vernon Broome came by to walk his dog. When he arrived, Vernon Broome saw the victim and respondent in the parking lot. The victim was working on the door to his truck, and Vernon Broome heard him tell respondent to get his clothes and get off his property. Vernon Broome did not witness a physical confrontation between the victim and respondent, but as he drove out of the parking lot, he heard a gunshot. The committee found Vernon Broome’s various statements about these events are consistent, from his interview with police on the date of the shooting to his testimony at the December 2005 preliminary examination and during the formal charge hearing.
|9In determining whether respondent was justified in shooting the victim, the committee noted his testimony from the 2008 formal charge hearing that he fired his gun after the victim had shot at him, but missed.[10] The committee rejected this testimony, finding the victim was not armed. The committee also rejected any assertion by respondent that someone tampered with the gun owned by the victim, as it was found locked in his house on his bed.[11] Finally, the committee rejected respondent’s claim that he acted in self-defense:
Two witnesses, Vernon Broome and John Griffin, were the only ones who could have corroborated that Larry Broome was attacking Charles Williams, but they did not. The police officer who interrogated Charles Williams immediately after the shooting did not notice that Charles Williams had any injuries about his face or hands. The officer did not see that any of his clothes were ripped or torn. Charles Williams did *590 not seek any medical treatment. With these facts we have to question a claim of self-defense, especially since both Vernon Broome and John Griffin heard Larry Broome tell Charles Williams to get his things and get off his property. It does not sound like Larry Broome is the aggressor; he is giving Charles Williams the chance to leave.
Based upon its factual findings, the committee concluded respondent committed a criminal act in violation of Rule 8.4(b) of the Rules of Professional Conduct. The applicable baseline sanction is disbarment.
The committee found no mitigating factors present. As an aggravating factor, the committee found respondent has prior discipline in Williams I.
Under these circumstances, the committee recommended respondent be disbarred.
| inThe ODC filed an objection to the hearing committee’s report, arguing the committee failed to conduct an appropriate review of the record to determine whether the offense of manslaughter was proven. The ODC also maintained that the sanction recommended by the committee is too lenient, and that permanent disbarment is warranted.

Disciplinary Board Recommendation

After review, the disciplinary board determined that the hearing committee’s factual findings are supported by the record and are not manifestly erroneous. Accordingly, the board adopted the factual findings contained in the committee’s report. Based on these facts, the board agreed with the committee that respondent violated Rule 8.4(b) of the Rules of Professional Conduct. The board reasoned that although respondent was not convicted of manslaughter, he admits that he shot and killed the victim. Moreover, the committee correctly found the ODC proved by clear and convincing evidence that respondent was not acting in self-defense when he committed the crime.
The board determined that respondent knowingly violated duties owed to the public and to the profession, causing actual injury. Relying upon Standard 5.11 of the ABA’s Standards for Imposing Lawyer Sanctions,[12] the board found the baseline sanction for respondent’s misconduct is disbarment.
The board found the aggravating factor of prior disciplinary offenses is present. The board found no mitigating factors supported by the record.
Considering respondent’s misconduct in light of the permanent disbarment guidelines and the prior jurisprudence of this court, the board recommended respondent be permanently disbarred.
1 ^Respondent filed an objection to the disciplinary board’s report and recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Banks, 09-1212 (La.10/2/09), 18 So.3d 57. While we are not bound in any way by the findings and recommendations of the hearing commit *591 tee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
In a disciplinary proceeding against an attorney who has been convicted of a crime, the attorney is conclusively presumed to be guilty of the crime. See Supreme Court Rule XIX, § 19(E). In such cases, the ODC bears no additional burden to prove the attorney’s criminal conduct; the sole issue to be determined is whether the crime warrants discipline and, if so, the extent thereof. Id.
The fact that an attorney has not been convicted of a crime does not preclude the ODC from proving the attorney committed a criminal act in violation of Rule 8.4(b) of the Rules of Professional Conduct. See, e.g., In re: Ruffin, 10-2544 (La.1/14/11), 54 So.3d 645; In re: Richard, 10-1479 (La.11/30/10), 50 So.3d 1284; In re: Clark, 09-1631 (La.12/1/09), 25 So.3d 728; and In re: Domm, 07-0348 (La.9/21/07), 965 So.2d 380. However, in such cases, the ODC is not entitled to the benefit of the presumption in Supreme Court Rule XIX, § 19(E) and must instead 1 T;>bear the burden of proving by clear and convincing evidence that the attorney committed a criminal act.
In the instant case, the undisputed facts establish that respondent shot and killed the victim. Nonetheless, respondent has taken the position that the shooting was justified pursuant to La. R.S. 14:20 because he reasonably believed he was in imminent danger of losing his life or receiving great bodily harm, and that killing the victim was necessary to save himself. Therefore, the ODC is required to establish that respondent did not act in self-defense when he shot Mr. Broome, and that the shooting was unjustified.
The hearing committee, which heard the testimony of respondent and other witnesses, made a factual finding that respondent did not act in self-defense. In reaching this conclusion, the committee made the following factual determinations: (1) respondent’s version of the altercation with Mr. Broome was not corroborated by the testimony of the witnesses; (2) the witnesses heard Mr. Broome tell respondent that he should collect his belongings and leave the premises, which suggests Mr. Broome was not the aggressor; and (3) the police officer who investigated the shooting did not observe any injuries to respondent’s face or hands, and respondent did not seek medical treatment after the incident. Based upon these facts, the committee concluded that respondent was not acting in self-defense when he shot Mr. Broome.
 In bar disciplinary cases involving credibility determinations, we generally defer to the factual findings of the hearing committee members who act as the eyes and ears of this court. See In re: Geiger, 09-2344 (La.2/12/10), 27 So.3d 280; In re: Holliday, 09-0116 (La.6/26/09), 15 So.3d 82; In re: Bolton, 02-0257 (La.6/21/02), 820 So.2d 548. This standard of review is not dissimilar from the standard we apply in civil cases, where it is well settled that when the findings are based on determinations regarding the credibility of witnesses, the manifest error-_Jclearly13 wrong standard demands great deference to the findings of fact, for only the factfinder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Based on our review of the record, we find no manifest error in the hearing *592 committee’s factual determinations. As the committee found, respondent’s account of the altercation, in which he characterized the victim as the aggressor, was not supported by the testimony of other witnesses or by the physical evidence.[13] Accordingly, we find the ODC met its burden of proving that respondent committed a criminal act when he shot and killed the victim, in violation of Rule 8.4(b) of the Rules of Professional Conduct.[14]
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any |14 aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
The record demonstrates that respondent knowingly violated duties owed to the public and to the profession, causing actual injury. The baseline sanction for respondent’s misconduct is disbarment.
Respondent’s prior disciplinary offenses are an aggravating factor in this case. The only mitigating factor present is the imposition of other penalties or sanctions, namely the eighteen months respondent spent in jail following his arrest.
Under the circumstances, we see no reason to deviate from the baseline sanction of disbarment. Accordingly, the sole remaining inquiry is whether respondent’s offenses are so egregious that he should be permanently prohibited from applying for readmission to the bar.
In Appendix E to Supreme Court Rule XIX, we set forth guidelines illustrating the types of conduct which might result in permanent disbarment. While these guidelines are not intended to bind this court in its decision-making process, they present useful information concerning the types of conduct we might consider worthy of permanent disbarment, including the following:
GUIDELINE 9. Instances of serious attorney misconduct or conviction of a serious crime, when the misconduct or conviction is preceded by suspension or disbarment for prior instances of serious attorney misconduct or conviction of a *593 serious crime. Serious crime is defined in Rule XIX, Section 19. Serious attorney misconduct is defined for purposes of these guidelines as any misconduct which results in a suspension of more than one year.
Here, respondent’s violation of Rule 8.4(b) is unquestionably serious attorney misconduct. This misconduct was preceded by his suspensions in 1986 and 2003 for prior instances of serious attorney misconduct. Therefore, both elements of Guideline 9 are satisfied.
11sWe have long recognized that permanent disbarment is the most serious form of professional discipline this court can impose and should be reserved for those cases where the attorney’s actions demonstrate a lack of moral fitness to practice law. See, e.g., In re: Smith, 09-2523 (La.3/12/10), 29 So.3d 484; In re: Jefferson, 04-0239 (La.6/18/04), 878 So.2d 503; In re: Morphis, 01-2803 (La.12/4/02), 831 So.2d 934. The facts of the instant case, considered together with respondent’s disciplinary history, evidence a convincing lack of character and moral fitness on respondent’s behalf. To maintain the integrity of the profession and to protect the public, we must permanently disbar respondent.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of Charles Williams, Louisiana Bar Roll number 13493, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. These conditions included the payment of $8,275 in restitution to two clients, attainment of a satisfactory score on the Multistate Professional Responsibility Examination, and payment of all costs of Williams I.

. It is noteworthy that Mr. Broome was also a Louisiana-licensed attorney, but was suspended from the practice of law at the time of his death. In re: Broome, 01-2260 (La.2/26/02), 815 So.2d 1.

. La. R.S. 14:20(A)(1) provides that a homicide is justifiable if "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.”

.La.Code Crim. P. art. 893(A) provides that the court may not suspend the sentence of a conviction for a crime of violence, including manslaughter.

. Respondent purchased the gun for $100 from a customer of the club. He carried the gun for protection while working at the club, and used it for target practice, in addition to carrying it with him on his walks.

. Mr. Griffin testified at the preliminary examination conducted in respondent’s criminal case, but he was not called to testify at the disciplinary hearing. During the preliminary examination, Mr. Griffin testified he also heard the gun shot, but he thought "it was somebody shooting in the air or something.” He continued on to Vernon Broome's house and did not return to the club.

. According to the report of the autopsy, the victim was 6'5" tall and weighed between 230-250 pounds. Respondent is 5'11" tall and weighed about 150 pounds.

. By contrast, the autopsy report indicates there were multiple abrasions on the victim's face at the time of death, specifically on his forehead in the area of the left and right eyebrows.

. Based upon the trajectory of the bullet as described in the autopsy report, the ODC asserted at the hearing that respondent "executed” the victim while standing over him. The hearing committee rejected this hypothesis, which notably was not supported by the testimony of a forensic or medical expert.

. During the March 2008 hearing, respondent first explained that he and the victim had an argument, during which the victim beat him “viciously,” and then "when he went to his pocket like he was going to shoot me, I shot him first.” However, respondent then went on to say that the victim "expended one bullet and missed me. I, in turn, fired and hit him.”

.The committee found the spent .380 caliber shell casing located at the scene (which was from the victim’s gun) was unrelated to the shooting at issue.

. Standard 5.11 suggests that disbarment is appropriate when a lawyer engages in "the intentional killing of another.”

. Although respondent contends the victim was armed and that someone must have tampered with the gun after the shooting, there is no evidence in the record to support this contention. As the hearing committee pointed out, the victim’s gun was found by the police locked in his house on the bed. The officers were only able to gain entry to the house after using respondent's set of keys to open the door.

. In brief and at oral argument, respondent suggests the committee committed legal error by failing to consider the victim's "dangerous character,” as demonstrated by numerous prior acts of violence allegedly committed by the victim. The ODC argued that such evidence is not admissible under the Louisiana Code of Evidence and should not be considered. However, we find we need not pass on the question of the admissibility of this evidence, because unlike a lay jury, this court, in its role as trier of fact in disciplinary cases, has the ability to consider the entire record and evaluate and weigh the probative value of evidence based on the totality of the circumstances. In re: Stamps, 03-2985 (La.4/14/04), 874 So.2d 113. Having considered respondent’s allegations of the victim’s dangerous character, we find it does not undermine the committee’s factual finding that there was no evidence the victim was the aggressor in this particular altercation.