25 So.3d 101 (2009)
In re Randy J. UNGAR.
No. 2009-B-0573.
Supreme Court of Louisiana.
October 30, 2009.
Charles Bennett Plattsmier, Baton Rouge, Robert Samuel Kennedy, Jr., Shreveport, for applicant.
Pascal F. Calogero, Jr., Dane S. Ciolino; Perry, Atkinson, Balhoff, Mengis & Burns, LLC, John W. Perry, Jr., Daniel Joseph Balhoff, Baton Rouge; Stanley, Reuter, Ross, Thornton & Alford, LLC, Richard Charles Stanley, New Orleans, Vicki Ann Elmer; Ungar & Byrne, APLC, Randy J. Ungar, for respondent.

*102 ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.[*]
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Randy J. Ungar, an attorney licensed to practice law in Louisiana.

UNDERLYING FACTS
In 1997, Kim Bullock Cutrera and John Meehan retained respondent to represent them in a putative class action against The Equitable Life Assurance Society of the United States ("the Equitable"). This action, known as the Duncan litigation, was pending in Orleans Civil District Court and alleged breach of contract, fraud, and deceptive practices by the Equitable and its agents in the marketing and sale of socalled "vanishing premium" life insurance policies. Respondent accepted the representation of Mrs. Cutrera and Mr. Meehan on a contingency fee basis. In connection with the representation, respondent associated with the Houston law firm of O'Quinn & Laminack ("O'Quinn"), which in turn associated the New York City law firm of Milberg, Weiss, Bershad, Hynes & Lerach ("Milberg Weiss"). Respondent had an agreement with O'Quinn to share any attorney's fees generated from the Duncan litigation "65% to your firm [O'Quinn] and 35% to Randy J. Ungar & Associates."
In December 1999, the trial court issued a ruling denying plaintiffs' motion to certify the Duncan class.[1] Plaintiffs appealed this ruling to the Fourth Circuit Court of Appeal. While the appeal was pending, respondent entered into negotiations with the Equitable's local counsel to settle Duncan. Mrs. Cutrera and Mr. Meehan were not aware of these efforts. When respondent's settlement attempts did not prove successful, Milberg Weiss began negotiating directly with the Equitable's national counsel in New York in the latter part of 2000. These settlement negotiations covered Duncan as well as two similar cases pending against the Equitable in courts in New York.
In October 2000, the parties reached a "global settlement" in which the Equitable agreed to pay $15 million to settle the three cases pending against it. The global settlement specified that the Equitable had no responsibility to divide the settlement funds among the plaintiffs or the lawyers. Rather, that task fell to the plaintiffs' counsel. As documented in correspondence subsequently circulated among the three plaintiffs' firms, plaintiffs' counsel proposed to allocate $4 million of the $15 million settlement to clients' claims, with the remaining $11 million to be divided among the lawyers.
The global settlement contemplated the execution of two documents: first, a "Settlement Agreement," which was to be executed by the attorneys, and second, a "General Release," which was to be executed by the individual clients in compromise of their claims against the Equitable. The Release did not specify or disclose the terms of the global settlement, nor did it specify the amount of the settlement the individual client would receive or the *103 amount of legal fees charged to the client. Rather, only the Settlement Agreement executed by the attorneys specified the amount of the $15 million global settlement. Respondent received the Settlement Agreement no later than December 13, 2000, but he did not give a copy of it to his clients, Mrs. Cutrera and Mr. Meehan.
Only after the global settlement was negotiated did the plaintiffs' lawyers set out to contact their clients to obtain their consent to the proposed settlement. In December 2000, O'Quinn attorney Angie Levinthal called Mrs. Cutrera to offer her the sum of $100,000 to settle her claims against the Equitable. Mrs. Cutrera asked Ms. Levinthal for details concerning the settlement, including the amounts the other plaintiffs would be receiving; however, Ms. Levinthal said she could not disclose this information because it was confidential. Mrs. Cutrera also inquired how much the plaintiffs' lawyers were going to obtain from the settlement, but Ms. Levinthal merely advised, falsely, that the lawyers were "taking a loss" on the case. Finally, Mrs. Cutrera expressed concern whether any attorney's fees would be taken from her portion of the settlement. In response, Ms. Levinthal told Mrs. Cutrera that respondent's contingency fees were not being deducted from her recovery but were being paid directly by the Equitable. At Ms. Levinthal's request, respondent wrote to Mrs. Cutrera on December 21, 2000 to confirm this advice, stating:
No additional attorneys fee will be charged to you out of your settlement as my fees will be paid directly by the defendant. You are relieved of your contingency fee with Randy J. Ungar & Associates.
Notably, the letter did not advise Mrs. Cutrera that respondent would collect an undisclosed amount of fees out of the $11 million portion of the settlement allocated by plaintiffs' counsel as attorney's fees. Moreover, the letter did not provide Mrs. Cutrera with any details of the Settlement Agreement.
On December 7, 2000, Milberg Weiss lawyers filed a motion to dismiss the Duncan lawsuit in Orleans Civil District Court. The court thereafter ordered the case dismissed with prejudice.[2] At the time of the dismissal, neither Mrs. Cutrera nor Mr. Meehan had (1) authorized a settlement, (2) received any details of the settlement, (3) signed any release, or (4) been advised that their lawsuit had been dismissed.
In early January 2001, on instructions from the Milberg Weiss lawyers, Ms. Levinthal forwarded the Release to Mrs. Cutrera and Mr. Meehan. Mr. Meehan brought the Release to respondent's office, seeking details of the settlement and a copy of the Settlement Agreement. Respondent promised his client he would get the requested information, but he never did. He further advised his client that if he did not sign the Release, he would get nothing from the settlement. Mr. Meehan was ultimately able to obtain a copy of the Settlement Agreement from Ms. Levinthal. He then signed the Release, settling his claim against the Equitable for $170,000.
For her part, when Mrs. Cutrera discovered that the Release required her to certify that she had been provided with details of the settlement,[3] when in fact she *104 had not, she refused to sign the Release. In January 2001, Mrs. Cutrera hired attorney Thomas Cortazzo to represent her in connection with the Equitable settlement.[4] On January 25, 2001, Mr. Cortazzo sent a letter to respondent and to the lawyers at O'Quinn and Milberg Weiss in which he requested details of the settlement in order to allow Mrs. Cutrera to evaluate the $100,000 settlement offer. Mr. Cortazzo also specifically requested a copy of the "Settlement Agreement, all exhibits thereto, and any other related documents."
After receiving Mr. Cortazzo's letter, respondent retained New Orleans attorney Richard Stanley as his "ethics counsel" to advise him regarding his obligations in this matter. Neither respondent nor Mr. Stanley ever provided Mr. Cortazzo with a copy of the Settlement Agreement, which as previously stated had been a part of respondent's file since December 2000.[5] However, upon Mr. Stanley's suggestion, respondent filed on Mrs. Cutrera's behalf a motion to set aside the order of dismissal in the Duncan case which the Milberg Weiss lawyers had previously obtained in Orleans Civil District Court. Respondent also decided to waive his fee interest in the Duncan litigation.
In March 2001, Mr. Cortazzo met with respondent, Mr. O'Quinn, and Mr. Weiss and learned for the first time that there was a firm agreement to settle the litigation against the Equitable. In April 2001, Mr. Cortazzo learned from Milberg Weiss that the settlement was for $15 million and that the plaintiffs' counsel were proposing to retain $11,460,000 as fees and costs.
With the assistance of Mr. Cortazzo, Mrs. Cutrera ultimately agreed to settle her claim against the Equitable for $550,000. Of this sum, Mrs. Cutrera paid $90,000 in legal fees to Mr. Cortazzo.
In 2002, Mrs. Cutrera and Mr. Meehan filed legal malpractice suits against respondent, O'Quinn, and Milberg Weiss. The suits were subsequently settled; Mrs. Cutrera received a $400,000 settlement and Mr. Meehan received a $335,000 settlement. Respondent did not admit liability in connection with the settlements.

DISCIPLINARY PROCEEDINGS
In 2001, both Mrs. Cutrera and Mr. Meehan filed complaints against respondent with the ODC.[6] In November 2006, the ODC filed one count of formal charges against respondent, alleging that his conduct as set forth above violated Rules 1.2 *105 (scope of the representation), 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.5(a) (a lawyer shall not make an agreement for, charge, or collect an unreasonable fee), 1.5(c) upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement showing the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination), 1.8(a) (a lawyer shall not knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client), 1.8(f) (a lawyer shall not accept compensation for representing a client from one other than the client), 1.8(g) (a lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients unless each client consents after consultation, including disclosure of the existence and nature of all the claims involved and of the participation of each person in the settlement), 1.8(i) (a lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client), 1.8(k) (a lawyer shall not solicit or obtain a power of attorney or mandate from a client which would authorize the attorney, without first obtaining the client's informed consent to settle, to enter into a binding settlement agreement on the client's behalf or to execute on behalf of the client any settlement or release documents), 8.4(a) (violation of the Rules of Professional Conduct), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct.[7]
Respondent answered the formal charges and denied any misconduct. He contended that he did not participate in the negotiations of the aggregate settlement of the litigation against the Equitable. Respondent suggested that there was a division of responsibility among his co-counsel, pursuant to which that responsibility fell to Milberg Weiss. At some point, respondent was told, without being shown any documents, that a $15 million settlement had been reached. Respondent maintained, however, that he was never privy to the proposed distribution of settlement funds between the clients and the lawyers, or how and by whom the decisions regarding the distribution would be made. Therefore, respondent contended that he did not refuse to share that information with his clients. Moreover, again referencing the division of responsibility among the plaintiffs' counsel, respondent noted the O'Quinn firm served as the clients' primary contact. On the few occasions when inquiries were directed to respondent, he suggested that he responded to them timely and to the best of his ability. Regarding the dismissal of Duncan, respondent stated that he was not consulted regarding the filing of the motion to dismiss and had no knowledge that it would be filed. Respondent later learned that Mrs. Cutrera and Mr. Meehan, at the time of the filing of the motion to dismiss, had not authorized the settlement, had not signed the releases sent to them by O'Quinn, and had not been informed of the terms of the settlement or of the fact that their claims were being dismissed. However, respondent maintained that he was unaware of these circumstances until after *106 Duncan had been dismissed by the trial court. Respondent noted that when he was informed of the "infirmities with the settlement," he promptly took remedial measures to protect the interests of his clients by filing a motion to set aside the dismissal in Duncan. Based on this reasoning, respondent denied that he violated the Rules of Professional Conduct as charged in the formal charges.

Hearing Committee Report
This matter proceeded to a formal hearing on the merits. After considering the evidence and testimony presented at the hearing, the hearing committee made the following findings:
Respondent maintains that after the denial of class certification, the O'Quinn and Milberg Weiss firms made all of the decisions and confected the settlement of the case, and that Mrs. Cutrera and Mr. Meehan were well aware that O'Quinn and Milberg Weiss were their attorneys post-certification hearing. Respondent therefore submits that he cannot be held ethically liable for the alleged misconduct of the out-of-state lawyers who were associated on the case. He avers that the Rules of Professional Conduct do not impose such a duty on him.
The committee found that respondent's restriction of his representation to the class certification hearing would not technically be a violation of Rule 1.2 of the Rules of Professional Conduct, as the retainer agreement signed by the clients clearly stated that respondent was under no obligation to continue the representation if the class was not certified. However, because respondent did not affirmatively or formally withdraw from the case after the certification hearing or otherwise discuss with or advise his clients of a change in his representation of them, the committee found it was reasonable for the clients to believe that respondent continued to represent them in all aspects of the litigation. In fact, respondent's actions evidenced that he continued to be involved in the case. Accordingly, the committee found that respondent's argument that he did not continue to represent the claimants after the certification hearing, and that O'Quinn and Milberg Weiss took over the case at that point, "was more a convenient shift of responsibility than was factual based on the actions of Respondent." Moreover, the committee observed that the association of other counsel does not allow respondent to unilaterally forego or abdicate his responsibilities to his client, or that the client acquiesces in that interpretation of the contract. Therefore, the committee concluded that respondent had an obligation to keep his clients informed and to engage them in decision making.
Likewise, the committee found that respondent violated Rule 1.3 in failing to act with reasonable diligence in obtaining information about the proposed settlement to permit his clients to determine whether that was in their best interests. He also violated Rule 1.4 in failing to communicate necessary and important information to permit his clients to make informed decisions about their legal matter. Neither Mrs. Cutrera nor Mr. Meehan were advised or otherwise consulted during the settlement negotiation process, and they had absolutely no idea about what was being proposed in settlement or what the actual settlement amounted to. Although respondent characterized his participation in the settlement negotiations as "very brief negotiations that occurred in Louisiana" and stated that the local lawyers were "nothing more than conduits for communications," the committee found that respondent signed a settlement offer, which evidenced his active participation in the *107 settlement process.[8] At every stage of the process, respondent's clients should have been made aware of the specifics of the settlement offers and of the ultimate settlement of the case; indeed, the committee noted, respondent's clients should have pre-approved the settlement.
Turning to the issue of fees, the ODC alleges that respondent violated Rule 1.5(a) by attempting to charge or collect an improper and/or excessive contingency fee. Additionally, the ODC avers that at the conclusion of Mr. Meehan's case, respondent failed to provide his client with a written statement reflecting receipts and disbursements.
Mrs. Cutrera signed a 40% contingency fee agreement with respondent. Mr. Meehan signed the same agreement but his attorney's fees were capped at 331/3%. However, the Equitable litigation was settled for the total sum of $15 million; the plaintiffs' attorneys proposed that $9-10 million of this sum would be retained for attorney's fees and nearly $2 million would be set aside for expenses. Based on these facts, the committee found that respondent attempted to secure a fee in derogation of the contingency fee contract.
The committee specifically noted that it found respondent's defense of "ignorance and incompetence to be unsupported and simply untruthful." In support of his case, respondent called his office assistant, Sharon Romero, to testify about how his office handled the Duncan litigation. Generally, Ms. Romero testified that after class certification was denied, all correspondence and pleadings relating to the case went directly to the file without respondent's review of the documents. The committee rejected this testimony, stating:
The Committee found Ms. Romero's testimony incredulous. Respondent would have this Committee believe that in a multi-million dollar case, in which he stood to make a substantial fee, he simply kept quiet, was not "really" consulted and would agree to whatever the O'Quinn firm deemed was fair for their team. We do not believe it and the record does not support it. We find Respondent consciously engaged in an attempt to withhold information from Cutrera and Meehan in complete derogation of their rights and in violation of the Rules of Professional Conduct.
Rather, the committee found "particularly enlightening" the testimony of attorney Thomas Cortazzo, whom Mrs. Cutrera retained after her repeated attempts to secure settlement information fell on deaf ears. On January 25, 2001, Mr. Cortazzo sent respondent, Mr. O'Quinn, and Mr. Weiss a letter questioning the settlement and requesting documents associated with the settlement. Prior to receiving Mr. Cortazzo's letter, respondent testified that he did not know there was any problem with the case generally or with his clients. He testified that after he received the letter he began to attempt to get to the bottom of the problem. Approximately a week after Mr. Cortazzo started calling respondent, he finally spoke with him. Mr. Cortazzo reiterated his request for the information outlined in his January 25, 2001 letter. Respondent advised Mr. Cortazzo that he did not have the information, *108 but would speak with the other attorneys and secure it from them.
Respondent did not provide the requested documents, but in March 2001 there was a meeting at the New Orleans Lakefront Airport with respondent, Melvyn Weiss, and John O'Quinn. Mr. Cortazzo was invited to attend. While waiting for Mr. Weiss to arrive at the airport, Mr. Cortazzo had an opportunity to speak briefly with respondent. Mr. Cortazzo re-urged his position on securing needed information and documents so that Mrs. Cutrera could make an informed decision with respect to the settlement offer. According to Mr. Cortazzo, respondent was "pretty adamant that [Mrs. Cutrera] should go ahead and accept the deal." Respondent informed Mr. Cortazzo that by not signing the settlement offer, Mrs. Cutrera "was risking the deal for herself and for everyone else."
Once Mr. Weiss arrived at the meeting, Mr. Cortazzo testified, it was simply "more of the same. They were trying to convince me that she should take the deal. And she was putting it all at risk for everyone involved. . . . [T]here was a lot of pressure. They were seeking to bring to bear on us to take the deal that they had offered to her." Mr. Cortazzo testified that at no point during the meeting did respondent make a request of his co-counsel to produce the information Mrs. Cutrera had requested to determine whether the settlement was in her best interest. Mr. Cortazzo stated that he felt respondent did not advocate on Mrs. Cutrera's behalf to try to get the information he had been seeking on her behalf.
The committee found this testimony by Mr. Cortazzo "illuminating and credible." The committee observed that respondent's role in Duncan after the class certification hearing "was far from passive." The committee found that respondent withheld information from his clients and attempted to do so with respect to Mr. Cortazzo, all in an effort to hide the amount of the settlement and thereby charge an excessive fee.
Furthermore, as to Mr. Meehan, the committee determined respondent failed to provide him with a disbursement sheet in his contingency fee matter, a violation of Rule 1.5(c) of the Rules of Professional Conduct.
Having found that respondent participated in the settlement negotiations and the proposed client and attorney's fee disbursement, the committee found it is clear that the proposed disbursement was contrary to the interests of Mrs. Cutrera and Mr. Meehan; that it was confected without full disclosure to the clients; that coercion was employed in an attempt to get the clients to sign the Release and to accept the settlement; and that the filing of a dismissal in Duncan was not authorized by the clients, all in violation of Rules 1.8(a)(f)(g)(i)(k) of the Rules of Professional Conduct. Most certainly, respondent's actions constituted a conflict of interest. Moreover, the committee found that respondent's actions were deliberate and were dishonest, deceitful, and motivated by self-interest, in violation of Rules 8.4(a)(c).
The committee determined that respondent violated duties owed to his clients and to the profession, and that he acted with knowledge of his wrongdoing. His securing a fee (or attempting to secure a fee) in violation of the retainer agreement between the parties is a significant potential injury to the affected clients, to respondent's law firm, and to the legal profession. Considering the ABA's Standards for Imposing Lawyer Sanctions, the baseline sanction for respondent's misconduct is suspension.
*109 The committee found the following aggravating factors apply: a dishonest or selfish motive, vulnerability of the victim, and substantial experience in the practice of law (admitted 1975). In mitigation, the committee recognized the following factors: absence of a prior disciplinary record, good faith effort to rectify the consequences of the misconduct, and a cooperative attitude toward the disciplinary proceedings.
Considering all the circumstances, and reiterating that respondent's conduct was intentional and not negligent, the committee recommended that respondent be suspended from the practice of law for two years.
Respondent filed an objection to the hearing committee's report. Respondent took issue with nearly all of the committee's findings and reiterated that the sanction in this case should not be more severe than a public reprimand.

Disciplinary Board Recommendation
After review, the disciplinary board found that the hearing committee's factual findings are not manifestly erroneous and are amply supported by the record. The board agreed with the committee that respondent violated the Rules of Professional Conduct as charged in the formal charges, with some minor modifications. The board also clarified that respondent did not violate Rule 1.8(f), but is culpable for his attempt to do so relating to his efforts to steer the settlement money to the plaintiffs' attorneys.
The board determined that respondent violated duties owed to his clients and to the profession. His conduct was knowing and intentional, and caused actual harm. Considering the ABA's Standards for Imposing Lawyer Sanctions, the board found that the applicable baseline sanction is disbarment.
The board found the following aggravating factors apply: prior disciplinary offenses,[9] a dishonest or selfish motive, vulnerability of the victim, and substantial experience in the practice of law. The board found the record supports no mitigating factors.
Finding that under all the circumstances, no downward deviation from the baseline sanction is warranted, a majority of the board recommended that respondent be disbarred. Two board members dissented and would recommend that respondent be suspended from the practice of law for two years, with one year deferred.
Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing *110 evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
While the underlying facts of this case are very complex, the crux of the misconduct alleged by the ODC is that respondent intentionally withheld information from his clients regarding the Equitable settlement in order to facilitate collection of an excessive fee. By contrast, respondent blames many of the problems in this case on his out-of-state co-counsel and characterizes any failure to communicate with his clients as negligent.
As a threshold matter, we reject any attempt by respondent to deflect culpability from himself to his out-of-state co-counsel. While there is nothing inherently wrong with dividing responsibilities among co-counsel, no division of labor agreement can relieve respondent of his ethical duties and responsibilities to his clients, Mrs. Cutrera and Mr. Meehan.
Turning to respondent's actions, a critical factual question is whether respondent intentionally misled his clients concerning the existence of the Settlement Agreement. The hearing committee, which had the benefit of actually seeing and hearing the testimony of respondent and the other witnesses, concluded that respondent's actions were intentional and deliberate. Based on our independent review of the record, we cannot say the hearing committee's factual findings are manifestly erroneous.[10]
In brief to this court, respondent makes much of the fact that Mrs. Cutrera did not ask him for a copy of the Settlement Agreement. However, a plain reading of Rule 1.4 makes it clear that it is incumbent upon respondent to provide relevant information to his clients; it was not his client's duty to request it. Moreover, it is beyond dispute that such a request was made once Mrs. Cutrera retained Mr. Cortazzo to represent her, but even at this point, respondent did not turn over the Settlement Agreement, notwithstanding that it was in his file and had been there for several months.
Based on these findings, we conclude the rule violations, as found by the hearing committee and disciplinary board, are supported by the record. Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions.
In considering that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter *111 future misconduct. Louisiana State Bar Ass'n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
The misconduct in this case, which involves elements of dishonesty and self-interest, is clearly serious in nature. Further, respondent's actions caused his clients actual harm, especially with regard to Mrs. Cutrera, who was required to retain new counsel. However, we recognize respondent eventually took some steps (admittedly belated) to minimize the harm of his actions by consulting counsel to determine his ethical duties, seeking to have the order of dismissal in Duncan set aside, and ultimately waiving his fee.
As aggravating factors, we recognize prior disciplinary offenses, a dishonest or selfish motive, vulnerability of the victim, and substantial experience in the practice of law (admitted 1975). However, these factors are counterbalanced by several mitigating factors, including a timely good faith effort to rectify the consequences of the misconduct, a cooperative attitude toward the disciplinary proceedings, delay in the disciplinary proceedings,[11] and remorse.
Considering all the facts and circumstances of this case, we find the appropriate sanction for respondent's misconduct is a three-year suspension from the practice of law.

DECREE
Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Randy J. Ungar, Louisiana Bar Roll number 12387, be and he hereby is suspended from the practice of law for three years. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
JOHNSON, J., would impose disbarment.
VICTORY, J., dissents and assigns reasons.
KNOLL, J., dissents in part and assigns reasons.
VICTORY, J.,
VICTORY, J., dissenting.
I dissent and would follow the Board's recommendation that respondent be disbarred.
KNOLL, J, concurring in part, dissenting in part.
I agree with the majority opinion's determination that there was no manifest error in the hearing committee's factual findings and that the record fully supports the rule violations as found by the hearing committee and disciplinary board. However, I dissent from the imposition of a sanction less than disbarment, finding a three-year suspension makes light of the severity of this attorney's conduct and sends the wrong message to the members of the bar and the public to whom attorneys owe a sacred trust.
Standard 4.31 of the ABA's Standards for Imposing Lawyer Sanctions makes it *112 clear disbarment is generally appropriate when a lawyer represents a client knowing his own interest are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client. Moreover, Standard 4.61 of the ABA's Standards for Imposing Lawyer Sanctions calls for disbarment when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.
Ungar would have us believe that after rejection of the class action certification his involvement was merely passive and that the Milberg Weiss and O'Quinn firms made all the decisions and confected the settlement agreement. Despite finding no merit to that contention, a majority of this Court nevertheless diminishes Ungar's wrongdoing when it opts for a downward deviation from the baseline sanction. I simply cannot agree with that choice.
After hearing live testimony and evaluating various pieces of documentary evidence, the hearing committee found Ungar:
 had an obligation to keep his clients informed and engage them in decisionmaking because his association of other counsel did not allow him to unilaterally forego or abdicate his responsibilities to his clients;
 failed to communicate necessary and important information to permit his clients to make informed decisions about their legal matter, specifically with regard to the settlement offers and the ultimate settlement of the case;
 attempted to secure a fee in derogation of the contingency fee contracts he signed with his clients;
 withheld information from his clients and attempted to hide the amount of the settlement so that he could charge an excessive fee;
 participated in settlement negotiations and proposed a disbursement to his clients that were contrary to the best interest of his clients;
 participated in the confection of a settlementwithout full disclosure to his clients; and,
 employed coercive tactics in an attempt to obtain his clients' signature to a release and settlement.
Finally, and most importantly, it was found Ungar's actions were deliberate, dishonest, deceitful, and motivated by self-interest.
"I am not bound to win, but I am bound to be true. I am not bound to succeed, but I am bound to live by the light that I have. I must stand with anybody that stands right, and stand with him while he is right, and part with him when he goes wrong." Abraham Lincoln, Speech at Peoria, IL (Oct. 16, 1854). Ungar failed to heed this sage adviceinstead of divulging the terms of the settlement agreement and disassociating himself from the Milberg Weiss and O'Quinn firms, he opted to leave his clients in the dark as he was blinded by the lucre that was almost certain to be his. As the record shows, Ungar, fully aware of the existence of the contingent fee contracts he entered into and the terms of the settlement agreement, continued to hide the pea as if this was nothing more than a shell game. Moreover, Ungar went so far as to attempt to have his clients sign release documents in which they were required to certify they had been provided the details of the settlement. "[T]he love of property and a consciousness of right or wrong have conflicting places . . . which often make a man's course seem crook[ed,] his conduct a riddle." Abraham Lincoln, Speech at Hartford, Connecticut (March 5, 1860). Significantly, Ungar's conduct was not self-reported. Rather, his conduct mirrors the classical conduct of one "getting *113 caught with his hand in the cookie jar." Although Ungar did not ultimately receive a legal fee, a course of action that only developed after Mrs. Cutrera retained Thomas Cortazzo as independent counsel and Ungar retained an "ethics counsel" to advise him, the course of Ungar's conduct speaks volumes and further highlights the obviousUngar's paramount concern was not the representation of his clients, but an attempt to secure an ill-contrived fee.
Most telling in this regard was the March 2001 meeting at the New Orleans Lakefront Airport which Ungar, Melvyn Weiss, John O'Quinn, and Cortazzo attended after he had retained an "ethics counsel." Despite Cortazzo's continued attempts to receive settlement information, Ungar persisted in his request that Mrs. Cutrera should accept the settlement, all to the detriment of Mrs. Cutrera, who was denied the very tool needed for her to properly evaluate the settlement offer. Clearly, Ungar's deceptive conduct at this meeting highlights the fact he chose to advocate against his client.
It gives me great pause to think what would have happened if Ungar's roadblocks to truth had been successful and Mrs. Cutrera had simply acquiesced to Ungar's self-motivated and deceptive counsel to sign the release. Had this happened, Ungar's egregious conduct would have been swept under the carpet and he would have been free to use his license to practice law to feather his own nest to the detriment of a future, unsuspecting public. Ungar's use of his license to practice law in this manner causes great harm to the legal profession and the public. Such questionable conduct should neither be condoned nor tolerated. Moreover, Ungar's conduct causes the public to harbor a real disdain for the legal profession and forever tarnishes the legal profession. Abraham Lincoln once said, "[R]esolve to be honest at all events; and if in your own judgment you cannot be an honest lawyer, resolve to be honest without being a lawyer." Abraham Lincoln, Notes for a Law Lecture (July 1, 1850).
I find Standards 4.31 and 4.61 of the ABA Standards for Imposing Lawyer Sanctions particularly applicable to the present case. For these reasons, I find Ungar's disbarment is the baseline standard from which I find no downward deviation merited. Rather, I find instead of considering a downward deviation, we should be debating whether permanent disbarment is merited.
NOTES
[*] Judge Benjamin Jones, of the Fourth Judicial District Court, assigned as Justice Pro Tempore, participating in the decision.
[1] The retainer agreements that Mrs. Cutrera and Mr. Meehan signed with respondent each contained a provision stating "that should any court ever determine that this claim ought not proceed as a class action, that ATTORNEY has no obligation to prosecute CLIENT's claim in an individual action." However, both clients testified that they received no indication from respondent that he intended to withdraw from their representation following the trial court's December 1999 ruling.
[2] Respondent was provided with a copy of the dismissal order but he testified that he did not read it before it was placed in the file. He further testified that he did not learn of the dismissal until his "ethics counsel," Richard Stanley, told him about it in February 2001.
[3] In pertinent part, the Release provided:

I represent and warrant that I have had a full opportunity to obtain, and have in fact obtained, the advice of my independent counsel with respect to the Settlement Agreement and this General Release. My independent counsel has fully apprised me of the terms, conditions and effect of the Settlement Agreement I am entering into with Equitable. I fully understand and agree to be bound by all of the terms of the Settlement Agreement. I have expressly authorized my counsel to sign the Settlement Agreement on my behalf, and by such execution, to bind me to the terms thereof.
[4] Mrs. Cutrera did not discharge respondent when she retained Mr. Cortazzo.
[5] Respondent testified that he did not realize he had the Settlement Agreement in his file. Mr. Stanley testified that he took respondent at his word when respondent told him that he did not have the information Mr. Cortazzo was looking for. Mr. Stanley further testified that he did not ask respondent specifically whether he had a copy of the Settlement Agreement, nor did he independently check respondent's file.
[6] Mrs. Cutrera and Mr. Meehan also filed disciplinary complaints against the lawyers from O'Quinn; however, the disciplinary agency in Texas dismissed the complaints without action. In addition, Mrs. Cutrera filed a complaint in New York against the lawyers from Milberg Weiss, but this complaint was likewise dismissed.
[7] The formal charges also alleged that respondent violated Rule 3.3 (candor toward the tribunal) by filing a pleading in the trial court "after being discharged by his client" in which he made a false representation of material fact, i.e., "his current representation of Kim Cutrera." However, this charge was withdrawn by the ODC during the formal hearing.
[8] In May 2000, Gene Fendler, local counsel for the Equitable, wrote to respondent and proposed the settlement of the Duncan litigation, based upon the value of each plaintiff's policy, the premiums paid, the policy death benefit, and similar parameters. On July 25, 2000, respondent submitted a counteroffer to Mr. Fendler in which he proposed that his clients should each receive the actual face amounts of their respective life insurance policies. Respondent also sought attorney's fees of $2 million and costs of $962,062.25.
[9] Respondent has been admonished on three prior occasions, two of which relate to some of the very types of misconduct he committed in this case. In 2000, respondent consented to an admonition for failing to provide disbursement sheets to his clients at the time of settlement. In 1997, respondent was admonished for misconduct in the first putative class action suit he handled. For allowing a solicitation letter to be sent to potential clients over his signature in violation of the advertising rules, respondent was also ordered by the trial judge to send a letter of correction, because the solicitation letter stated that the defendant's life insurance policies were worthless, when in fact they were not.
[10] The board made a finding that respondent lied to Mr. Stanley regarding the Settlement Agreement. First, even assuming for purposes of argument that such conduct occurred, it does not form part of the formal charges. Second, the record does not support the board's finding, as the only evidence on this point is to the effect that respondent was mistaken when he told Mr. Stanley that he did not have the Settlement Agreement. There is nothing in the record to suggest that respondent intentionally misled Mr. Stanley. Finally, the hearing committee did not make such a factual finding. As this court recently observed in In re: Holliday, 09-0116 (La.6/26/09), 15 So.3d 82, the board serves an appellate review function under Supreme Rule XIX, § 11(F) and should therefore "refrain from making findings based on a cold record."
[11] The complaints in this matter were filed in 2001, but the ODC did not file formal charges until November 2006.